# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 99 C 50337 | **DATE** | 7/16/2004 |
| **CASE TITLE** | LARAMEE vs. WARN INDUSTRIES, INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, Defendant's Motion to Bar is denied.

(11) ● [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | number of notices | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | JUL 19 2004 date docketed | 65 |
| | Notified counsel by telephone. | | | | |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | U.S. DISTRICT COURT | | |
| | Copy to judge/magistrate judge. | | 2004 JUL 16 PM 2:39 | 7/16/2004 date mailed notice | |
| LW | courtroom deputy's initials | | Date/time received in central Clerk's Office | LW mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| JAMES LARAMEE, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 99 C 50337 |
| WARN INDUSTRIES, INC., | ) P. Michael Mahoney |
| Defendant. | ) |
| WARN INDUSTRIES, INC., | ) |
| Third Party Plaintiff, | ) |
| v. | ) |
| U-HAUL OF ILLINOIS, INC., | ) |
| Third Party Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

James Laramee ("Plaintiff") sued Warn Industries, Inc. ("Defendant") alleging strict products liability (Count I), negligent design (Count II), and failure to warn (Count III). This case is set for trial the first week of August 2004. Currently before this court is Defendant's Motion to Bar the Opinions of Dennis Dyl ("Motion to Bar"). Plaintiff has responded and Defendant has filed a reply brief. For the following reasons, Defendant's Motion to Bar is denied.

### Background

On January 15, 1999, Plaintiff, an employee of U-Haul of Illinois, was working at the Forest Hills, Rockford, Illinois U-Haul facility. Specifically, Plaintiff was working on a U-Haul transport

truck upon which Defendant's Model M 120000 electric power winch was mounted on the front.[1]

While standing in between two U-Haul trailers in the course of his work, Plaintiff became pinned and crushed between the two trailers when allegedly Defendant's Model M 120000 winch engaged, and pulled one trailer into the Plaintiff, pinning him against another trailer.

At issue are Dennis Dyl's ("Mr. Dyl"), Plaintiff's proposed expert, opinions and his report regarding Defendant's Model M. 120000 electric power winch. By way of background, Mr. Dyl graduated from Northern Illinois University in 1974 with a Bachelor's of Science in electrical engineering technology. After undergraduate (although apparently not right away), Mr. Dyl attended Illinois Institute of Technology and received his Master's Degree in Electrical Engineering in 1991. Mr. Dyl has been a registered professional engineer in the State of Illinois since 1998. Additionally, Mr. Dyl has been a registered professional engineer in the State of Wisconsin since 1997 and the State of Michigan since 2000. In 1978, Mr. Dyl worked for Packer Engineering. Mr. Dyl left Packer Engineering after a little more then 19 years of service to work for Bodycote-Taussig.

In preparing his report, Mr. Dyl examined the police report, the depositions of two other engineers, Defendant's answers to Plaintiff's interrogatories, fifty-nine color photographs of the winch, remote cables and controls, and engineering notices for the control pack and remote control. Mr. Dyl's review of these materials led him to two conclusions: 1) the cable connecting the remote control switch to the winch should have contained a five-wire conductor rather than a three-wire

---

[1] The wire winch cable was drawn through a pulley system to a port in the bulkhead of the carrier's trailerbed. From there, an operator, such as Plaintiff, could attach the cable hook to a trailer tongue, in order to pull the trailers up on to the bed rails by pulling cable in, or let them down by letting cable out. To control the winch, Defendant allegedly supplied the user/operator with a toggle switch device at the end of a 12-foot, three-wire power cord. The remote had three positions: a spring-loaded neutral/center position; a toggle forward; and a toggle back.

conductor; and 2) the winch should have been designed with a thermal device.

Mr. Dyl first asserts that the cable connecting the remote control switch to the winch should have contained a five-wire conductor because the use of five-wire conductor cable connected to a 12-volt supply is safer than a three-wire conductor. The reason for this assertion, according to Mr. Dyl, is with the use of a three-conductor cable, one conductor cable is connected to a 12-volt supply and the other two conductor cables run parallel to the one or are braided around it. This in turn creates one 12-volt energized cable and two cables that feed back to the winch – one is to spool in the wire and one to spool out. The cable is then controlled by a single-throw, double pole switch with a center off position, which is spring loaded so it sits at zero. According to Mr. Dyl, if there is any damage to the cable the switch will no longer function and the winch will operate, either spool in or spool out, depending on which cable faults to the energized cable. The end result being that, depending on where the damage to the cable occurred, the short may result in a power out rather than a power in thereby completely negating the remote control switch. The use of a five-conductor cable, on the other hand, according to Mr. Dyl, would require a short to both the energized conductor and the ground conductor to the switched ground conductor. Thus, in Mr. Dyl's opinion, the use of the five-conductor cable would have lessened the chance of cable damage causing the winch to activate.

Mr. Dyl's second opinion is that the winch should have been designed with a thermal device. According to Mr. Dyl, an over-current safety device was not installed in the motor or within the controls of the winch. The installation of a thermal device would shut down the winch if it jams. This type of device is sensitive to both the current and the time the current is applied. As such, the starting current of the winch would not cause the device to operate.

Defendant seeks to bar Mr. Dyl's opinions regarding both the winch's remote control cable and the incorporation of a thermal device in the winch. Turning first to the remote control cable, as stated above, Mr. Dyl opined that the control cable connecting the winch to the remote control should have been designed with a five-wire conductor rather than a three-wire conductor. Defendant seeks to bar this opinion because Mr. Dyl "readily admitted that he has not conducted any testing of his proposed design, that his proposed design would not be immune from shorts, and he can not state with certainty that his proposed design would have prevented the accident in this case." (Def.'s Mot. To Bar at 3). Additionally, while Mr. Dyl testified that he possessed sufficient information regarding the case in order to complete his report and render his opinion, Defendant argues Mr. Dyl did not even review Plaintiff's deposition or examine the winch or determine where in the cable the fault was located. (*Id.* at 4). In addition to not examining the winch, Defendant argues Mr. Dyl did not conduct any kind of testing or research on his proposed five-wire conductor design nor did he consult any trade publications regarding the uses of a five-wire conductor. (*Id.* at 5). According to Defendant, the only support he offers that a five-wire conductor should have been used is Mr. Dyl's "unverified assertion that a five-wire conductor is safer." (*Id.* at 6-7). Therefore, Defendant argues Mr. Dyl's opinions are speculative in nature and lacking in scientific reliability and not sufficiently reliable because Mr. Dyl has not conducted any tests regarding his theory. (*Id.* at 5-6)(citing *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002)("the absence of any testing indicates that [the expert's] proffered opinions cannot fairly be characterized as scientific knowledge."); *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999)(finding that the trial court properly excluded expert's testimony where he had "conducted absolutely no scientific test" to support his conclusions)).

4

Plaintiff, on the other hand, argues Mr. Dyl is not offering any opinions specific to the particular winch at issue or the causation of the remote control compromise, but rather, Mr. Dyl's opinions relate to the design of the product itself and whether the product is unreasonably dangerous or defective. (Pl.'s Resp. to Def.'s Mot. to Bar at 3-6). Specifically, in relying upon Defendant's engineering documents, photographs, deposition testimony of Defendant's engineers and his own knowledge and experience, Plaintiff argues Mr. Dyl opinions are based upon commonly accepted principles within the field of electrical engineering. In fact, Plaintiff argues Mr. Dyl's opinion, that a five-wire system substantially increases the number of possible wire-contact permutations, is agreed upon by Defendant's engineer Steve Hodge. To be true, Plaintiff argues that Mr. Dyl's opinions and Mr. Hodge's opinions only differ with regards to whether the product is unreasonably dangerous or defective and whether Defendant acted reasonably in selling the subject winch with a three-wire circuit switch. (*Id.* at 6). As such, Plaintiff asserts that it makes no sense for Mr. Dyl to test his opinions because the added safety of the five-wire design is a widely accepted principle within the field of electrical engineering. (*Id.* at 7).

With regards to Mr. Dyl's opinion concerning the incorporation of a thermal device in the winch, Defendant argues Mr. Dyl's opinion should be barred because Mr. Dyl has not subjected this design to scientific method and he can not demonstrate that his alternative design would have prevented the accident. (Def.'s Mot. To Bar at 7). Specifically, according to Defendant, Mr. Dyl's opinion is that the winch should be set for a maximum current and maximum amount of time and would open if it was sensing a jam in the winch and would be shut down before excessive amperage flowed through the cable. The thermal device, however, would not immediately shut down the winch in the case of a jam; rather, a particular current would have to be achieved and maintained

over a period of time before the thermal device would shut down the winch. This would depend on the customer specific settings. Defendant argues Mr. Dyl has no opinion regarding what settings should be used in this case. In fact, Defendant asserts Mr. Dyl did not even know what settings should be hardwired into the device because he did not know the amount of load that had been on the winch during the accident in this case. (Def.'s Mot. To Bar at 8). Therefore, because Mr. Dyl has not conducted any tests of his design, has not prepared any detailed designs of the device, conducted any calculations to demonstrate how it would work and what settings it should have, Defendant argues Mr. Dyl's opinion should be barred.

Plaintiff, on the other hand, argues that current sensitive devices were readily used in electrically powered devices within the industry at the time of the accident and Mr. Dyl's opinion is a very basic concept in the field of electrical engineering. (Pl.'s Resp. to Def.'s Mot. to Bar at 8-9). Further, Plaintiff points out that during Mr. Hodge's deposition (Defendant's expert), documents were produced evidencing the fact that thermal detection devices and current overload devices were integrated into other of Defendant's product lines near the time of this accident at issue. While Mr. Hodge admitted as much, according to Plaintiff, Mr. Hodge questioned the feasibility of using a current overload shutoff at the switch. Plaintiff argues, however, that Mr. Dyl, at his deposition, explained the methodology in integrating such a device to overcome Mr. Hodge's concerns and Mr. Dyl explained commonly used and readily available electrical circuitry components that could also be integrated. In fact, Mr. Dyl gave examples of the use of those types of circuitry systems in general industry power equipment based on his knowledge and experience. As such, Plaintiff argues that, because the scientific design alternative Mr. Dyl proposed in this case has already been tested, and Mr. Dyl cited existing products as proof, Mr. Dyl's design alternative does not have to be tested and

is accepted as a viable methodology. (Pl.'s Resp. to Def.'s Mot. to Bar at 9). Lastly, Plaintiff argues Mr. Dyl did not have to inspect the winch because first, the winch is of little value (the winch had allegedly been cut by the fire department at the scene, removed from the truck, partially disassembled, and locked up by the police) and second, the winch would offer little or any relevant information because Mr. Dyl's opinions go to the design of the winch and the relationship between the design defects and how design changes would result in a safer product. (Pl.'s Resp. to Def.'s Mot. to Bar at 10).

## **Discussion**

Defendant challenges Mr. Dyl's report and subsequent deposition testimony for failing to comply with the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702. The admissibility of expert testimony is governed by Federal Rules of Evidence 702, which states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine the fact in issue, a witness qualified as an expert by knowledge, skill experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Expert testimony must be both relevant and reliable. *Daubert*, 509 U.S. at 590-91. In determining reliability, a court may consider "(1) whether the theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the theory in the scientific community." *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 643 (7th Cir. 1995); *Daubert*, 509 U.S. at 591-595.

This list, however, "is neither definitive nor exhaustive, but rather flexible to account for the various types of potentially appropriate expert testimony." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004)(citing *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003).

Additionally, this court may consider "whether the expert[] [is] proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Stasior v. National Railroad Passenger Corp.*, 19 F. Supp. 2d 835, 846 (N.D. Ill. 1998)(Williams, J.)(citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)). Generally, the most important factor in the *Daubert* analysis is whether the proffered theory can be and has been tested by the scientific method. *Bradley v. Brown*, 42 F.3d 434, 438 (7th Cir. 1994); *Stasior*, 19 F.Supp. 2d at 846. Thus, a scientific theory that is not supported by appropriate validation is not admissible under Rule 702. *Daubert*, 509 U.S. at 590.

This court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission. *See Mihailovich*, 359 F.3d at 918. With this role in mind, this court finds Mr. Dyl's opinions to satisfy Rule 702 and *Daubert*. First, Mr. Dyl is qualified to give opinions with regards to the safety of a five-wire conductor versus a three-wire conductor and the use of a thermal device. Since 1974, the year Mr. Dyl graduated with a degree in electrical engineering, Mr. Dyl has been involved in the electrical engineering field. He has worked for various companies as an electrical engineer, is licensed in Illinois, Wisconsin and Michigan, and received his Masters in Electrical Engineering from Illinois Institute of Technology. Therefore, this court finds that Mr. Dyl is qualified to assert the opinions he has made in this case.

Furthermore, Mr. Dyl is not offering any opinions specific to the particular winch at issue

or the causation of the remote control compromise, but rather, Mr. Dyl's opinions relate to the design of the product itself and whether the produce is unreasonably dangerous or defective. In fact, Mr. Dyl's opinions not only are commonly accepted principles, but Mr. Hodge, Defendant's own expert, seems to agree with many of the assertions made by Mr. Dyl. The only point of connection between these two electrical engineers is whether the product is unreasonably dangerous or defective. This is true not only for Mr. Dyl's opinion regarding the five-wire conductor, but also with regards to the thermal device.

While it is true that Mr. Dyl did not actually view the winch at issue or test it, such actions are not necessary. As stated above, Mr. Dyl's opinion is not winch specific. Rather, his opinions go to the general design of the winch and its safety. While Defendant may disagree with Mr. Dyl's opinion, Defendant cannot argue that Mr. Dyl's opinions are revolutionary or unheard of. Quite the contrary. Mr. Dyl's methodology is not only industry accepted, but seems to be in practice within the industry, at times even within Defendant's own product lines (i.e. the thermal detection device). Defendant has failed to show where Mr. Dyl's methodology departed from those of other electrical engineers. Specifically, aside from arguing that Mr. Dyl never viewed or tested the winch at issue, Defendant has failed to show how Mr. Dyl's reliance on a police report, depositions of two other engineers, Defendant's answers to Plaintiff's interrogatories, fifty-nine color photographs of the winch, remote cables and controls, engineering notices for the control pack and remote control, and Mr. Dyl's own education and experience deviate from the normal methodology used in opinions such as Mr. Dyl's. This court agrees with Defendant that if Mr. Dyl's opinion was winch specific then there would be some problems, especially because Mr. Dyl never viewed the winch or tested it. Mr. Dyl's opinions, however, are not winch specific but are, rather, more general. Electrical engineering

principles are generally beyond the average juror (and many lawyers). Mr. Dyl has been called to explain these and other corollary electrical circuitry design concepts. In this role, Mr. Dyl satisfies Rule 702. Therefore, in applying Rule 702 and the principles of *Daubert*, this court denies Defendant's Motion to Bar.

### Conclusion

For the above stated reasons, Defendant's Motion to Bar is denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 7/16/04